**FILED**

OCT 19 2016

At _____ M
ROBERT N. TRGOVICH, Clerk
U.S. DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      v.<br><br>CHRISTOPHER G. SALIS,<br>DOUGLAS M. MILLER, and<br>EDWARD M. MILLER,<br>      Defendants. | CRIMINAL NO.  **2 · 16 CR  1 4 8**<br><br>**I N D I C T M E N T**<br><br>18 U.S.C. § 1349 (Conspiracy to Commit<br>    Wire Fraud & Securities Fraud);<br>18 U.S.C. § 1343 (Wire Fraud);<br>18 U.S.C. § 1348 (Securities Fraud);<br>18 U.S.C. § 1956(h) (Conspiracy to Commit<br>    Money Laundering);<br>18 U.S.C. § 371 (Conspiracy to Structure<br>    Financial Transactions);<br>18 U.S.C. § 1512(c)(1) (Obstruction of<br>    Justice);<br>18 U.S.C. § 1512(d)(1) & (d)(2) (Witness<br>    Harassment);<br>18 U.S.C. § 1001 (False Statements);<br>18 U.S.C. § 2 (Aiding and Abetting) |

The Grand Jury charges that:

## I.    BACKGROUND

### A.    Concur Technologies, Inc. and SAP SE

1.    Concur Technologies, Inc. ("Concur") was a software development company headquartered in the United States.  Concur focused on software that provided travel and expense management services to businesses.

2.    Concur's stock was listed on NASDAQ, a national securities exchange, and was registered with the United States Securities and Exchange Commission ("SEC"), an agency of the United States, pursuant to Section 12(b) of the Securities Exchange Act of 1934.

3.    SAP SE ("SAP") was a multinational software company headquartered in Germany, with offices all over the world, including London, England and Palo Alto, California. SAP focused on developing software for businesses and other organizations.

1

4.      In or around May 2014, executives from SAP contacted senior executives from Concur.  Subsequent to this initial contact, employees of the two companies met in Palo Alto, California to discuss the business of Concur.

5.      During in or around July and August 2014, employees from Concur and SAP engaged in a series of discussions regarding the potential acquisition of Concur by SAP.

6.      On or about August 19, 2014, Concur and SAP discussed a possible acquisition at a price of approximately $129 per share.  On or about August 23, 2014, the two companies executed an agreement giving SAP the exclusive right to negotiate with Concur and allowing SAP to complete its due diligence review.

7.      After due diligence was completed, on or about September 18, 2014, the Boards of Directors for Concur and SAP separately approved SAP's acquisition of Concur at a price of approximately $129 per share.

8.      SAP's acquisition of Concur ("the Concur Acquisition") was publicly announced on or about September 18, 2014.

**B.     Call Options**

9.      A call option gives an investor the right (but not the obligation) to buy a stock at a specified price within a specific time period, provided that the underlying stock price reaches a "strike price" (the price at which the option can be exercised) on or before the expiration date.

10.     A call option is considered "out-of-the-money" if the underlying stock price is below the strike price at the time the option is purchased.  If the stock price never reaches the strike price by the expiration date, the call option has little to no value.

11.     A call option that expires in the "near-term" is one that is expiring in a short period of time.  The purchase of a near-term, out-of-the-money call option generally indicates a belief that the underlying security price will rise to the strike price of the option in the near-term.

12.     A call option is considered "in-the-money" if the underlying stock price is above the strike price.  If a call option becomes in-the-money, an investor who purchased that option position can recognize his or her profits by selling the previously purchased option, a practice known as "sell to close."

13.     A brokerage firm is a financial institution that facilitates the buying and selling of securities.  Many brokerage firms allow qualified and authorized clients to purchase call options through accounts with the firm, commonly known as "brokerage accounts."

**C.     The Defendants**

14.     **CHRISTOPHER G. SALIS** ("**SALIS**") was a Global Vice President at SAP. **SALIS** was based in SAP's office in Palo Alto, California and regularly traveled to SAP's office in Walldorf, Germany.

a.  By virtue of his position at SAP, **SALIS** became aware of material, nonpublic information regarding the nature and timing of the Concur Acquisition (the "Inside Information").

b.  As an employee of SAP, **SALIS** was subject to SAP policies.  Those policies prohibited (1) the use of Inside Information to acquire or dispose of securities for one's own account or for that of another person; (2) the disclosure of Inside Information to others without authorization; and (3) recommending, on the basis of Inside Information, acquisition or disposal of securities to another person.

    c. Consequently, **SALIS** had a duty, absent authorization, not to (1) disclose the Inside Information regarding the Concur Acquisition that he obtained through his employment at SAP to third parties not involved in the Concur Acquisition, or (2) use such information for his personal benefit or the benefit of others.

15.     **DOUGLAS M. MILLER** ("**D. MILLER**") was a resident of Dyer, Indiana. **D. MILLER** was a close friend of **SALIS**. **SALIS** and **D. MILLER** met each other in college at Purdue University and have been close friends for approximately the last twenty years.

16.     **EDWARD M. MILLER** ("**E. MILLER**") was a resident of Munster, Indiana. **E. MILLER** and **D. MILLER** were brothers, and both were employed as owners of a car wash business located in Saint John, Indiana.

**D.**     <u>**Other Co-Conspirators**</u>

17.     B.B. was a resident of Chicago, Illinois. B.B. was a regional sales manager for a national energy drink company.

18.     K.D. was a resident of Chicago, Illinois. K.D. was a national sales manager for a national energy drink company.

19.     E.M. was a resident of Munster, Indiana. E.M. was the father of **D. MILLER** and **E. MILLER**.

20.     S.M. was a resident of Munster, Indiana. S.M. was the mother of **D. MILLER** and **E. MILLER**.

## II. THE SCHEME TO DEFRAUD

**A.**     <u>**Overview of the Scheme**</u>

21.     From in or around August 2014 and continuing through in or around at least July 2015, defendants **SALIS, D. MILLER, E. MILLER**, and others, known and unknown to the

Grand Jury, devised, intended to devise, and executed a scheme to (a) engage in and profit from securities transactions, specifically, the purchase and sale of call options in Concur, executed on the basis of Inside Information that **SALIS** relayed about the Concur Acquisition in breach of a duty of trust and confidence owed to SAP; (b) conceal their involvement in certain purchases and sales of call options by recruiting other co-conspirators to open brokerage accounts, through which **D. MILLER** purchased and sold call options on behalf of himself, **SALIS**, **E. MILLER**, and others; (c) obtain the ability to trade certain call options through false representations about individuals' financial condition and experience trading securities; (d) structure financial transactions in a manner designed to avoid detection; and (e) make false representations concerning the basis for the defendants' purchase of Concur options.

### B.     Purpose of the Scheme

22.     The purpose of the scheme was for **SALIS, D. MILLER, E. MILLER**, and their co-conspirators to profit from securities transactions executed on the basis of Inside Information related to the Concur Acquisition, which **SALIS** obtained through his employment at SAP.

### C.     Disclosure of Inside Information in Violation of a Duty of Trust and Confidence

23.     Between approximately August 2014 and September 2014, **SALIS** learned material, nonpublic information about the Concur Acquisition through his employment at SAP. As an employee, SALIS owed SAP a duty of trust and confidence not to disclose or trade on such information.

24.     Beginning in approximately August 2014 and continuing into September 2014, **SALIS**, without the permission of SAP, and in violation of his duty of trust and confidence owed to SAP, disclosed to **D. MILLER** certain Inside Information related to the Concur Acquisition, so that **D. MILLER** and others could purchase securities based, in whole or in part, on this Inside

Information, knowing it to be disclosed by **SALIS** in breach of a duty of trust and confidence owed to SAP, for the purposes of profiting from these transactions and returning a portion of the profits to **SALIS.**

25.     After receiving the Inside Information from **SALIS**, **D. MILLER** disclosed the Inside Information to his brother, **E. MILLER**, so that **E. MILLER** could participate in the scheme to purchase securities based on this Inside Information, knowing it to be disclosed by **SALIS** in breach of a duty of trust and confidence owed to SAP, for the purposes of profiting from these transactions.

### D.    Opening Brokerage Accounts

26.     In or around August 2014, after **SALIS** first disclosed certain Inside Information to **D. MILLER**. **D. MILLER** then recruited **E. MILLER**, as well as his mother, S.M., and father, E.M., into the scheme. **D. MILLER** recruited his family by offering them, among other things, an opportunity to share in part of the illegal proceeds.

27.     On or around August 18, 2014, in order to buy and sell call options in SAP, **D. MILLER** and **E. MILLER** separately opened new brokerage accounts at a known Brokerage Firm ("Broker A"). On or about August 20, 2014, S.M. reactivated a dormant brokerage account at Broker A. After opening their brokerage accounts, S.M. and **E. MILLER** provided **D. MILLER** with access to their brokerage accounts so that he could purchase call options in Concur.

28.     On or around August 25, 2014, **SALIS** was provided with usernames and passwords to the brokerage accounts of **E. MILLER** and **D. MILLER** in order to allow him access to their brokerage accounts.

29.     On or about September 9, 2014, in an effort to buy more call options in Concur without drawing greater scrutiny to the trading activity, **D. MILLER** recruited B.B. and K.D. into

the scheme. **D. MILLER** then directed B.B. and K.D. to open brokerage accounts with Broker A, which B.B. and K.D. proceeded to do. After opening their brokerage accounts, B.B. and K.D. provided **D. MILLER** with access to their brokerage accounts so that he could purchase call options in Concur.

30.     In order for **D. MILLER** to be able to purchase call options in Concur as quickly as possible, each of the five account holders obtained cashier's checks to fund their respective accounts. The account holders delivered the checks in person to physical branches of Broker A. In order to avoid greater scrutiny about their trading activity, **D. MILLER, E. MLLER**, and others ensured the amount of money deposited in each of the five brokerage accounts was under $10,000.

### E.     Misrepresentations on Options Applications

31.     The Financial Industry Regulatory Authority ("FINRA") is an independent organization authorized by Congress to regulate the financial industry and enhance market integrity. FINRA regulates a variety of broker dealers in the U.S. financial industry, including Broker A, and promulgates rules that regulated entities must follow.

32.     FINRA requires all broker dealers that sell options, including Broker A, to collect information from applicants in order to assess their financial fitness and sophistication to trade options.

33.     In order to evaluate whether to permit a brokerage account holder to trade call options, Broker A required all account holders who wished to trade call options to complete an options application. Broker A's application clarified that the information requested in the application was required by FINRA and was used to assess an applicant's eligibility to open an options account. The application requested information that included an applicant's annual income, net worth, liquid assets, and years of investment experience. Broker A used the

information submitted by the applicant to determine whether to authorize the account holder to trade options.

34.     On or about August 25, 2014, in order to buy and sell call options, **D. MILLER**, **E. MILLER**, and S.M. all completed options applications for their respective brokerage accounts at Broker A.  On his application, **E. MILLER** provided false information about, among other things, his investment experience.

35.     On or about September 9, 2014, **D. MILLER** directed B.B. and K.D. to submit options applications for their respective brokerage accounts at Broker A.  In order to ensure B.B.'s account was approved to trade call options, **D. MILLER** directed B.B. to submit false information about his net worth, liquid assets, and investment experience.  Likewise, in order to ensure K.D.'s account was approved to trade call options, **D. MILLER** directed K.D. to submit false information about his net worth, liquid assets, and investment experience.  At **D. MILLER**'s direction, both B.B. and K.D. submitted options applications bearing false information to Broker A.

**F.     Purchase of Call Options**

36.     After the five brokerage accounts were opened and funded, **D. MILLER** accessed each of the accounts and used the Inside Information provided by **SALIS** to purchase Concur securities, specifically, near-term, out-of-the-money call options, some of which were scheduled to expire as soon as four days after they were purchased.  **D. MILLER** purchased these call options with the knowledge and assistance of **E. MILLER**, S.M., B.B., and K.D., who among other things provided **D. MILLER** with access to their brokerage accounts, funded their accounts by transmitting cashier's checks, and monitored their brokerage accounts after the call options had been purchased.

37.    The following chart shows the purchases of near-term, out-of-the-money call options by **D. MILLER** in the five brokerage accounts:

| Approx. Date | Approx. Time (Central) | Account Holder | Strike Price | Expiry Date |
|---|---|---|---|---|
| 8/25/2014 | 21:15 21:21 | **D. MILLER** | 69 at $110 8 at $115 | 10/18/2014 9/20/2014 |
| 8/25/2014 | 22:00 | **E. MILLER** | 42 at $110 | 10/18/2014 |
| 8/26/2014 | 10:06 | S.M. | 55 at $110 | 10/18/2014 |
| 8/26/2014 | 10:10 | S.M. | 17 at $110 | 10/18/2014 |
| 8/26/2014 | 10:14 | S.M. | 5 at $110 | 10/18/2014 |
| 8/26/2014 | 10:47 | S.M. | 2 at $110 | 10/18/2014 |
| 8/27/2014 | 11:43 | **E. MILLER** | 38 at $110 | 10/18/2014 |
| 8/27/2014 | 11:46 | **E. MILLER** | 2 at $110 | 10/18/2014 |
| 8/27/2014 | 11:51 | **E. MILLER** | 12 at $115 | 9/20/2014 |
| 8/27/2014 | 11:55 | S.M. | 1 at $110 | 10/18/2014 |
| 9/11/2014 | 13:25 | B.B. | 20 at $120 | 10/18/2014 |
| 9/11/2014 | 13:28 | B.B. | 15 at $115 | 9/20/2014 |
| 9/11/2014 | 15:31 | K.D. | 7 at $120 | 10/18/2014 |
| 9/12/2014 | 11:35 | B.B. | 10 at $115 | 9/20/2014 |
| 9/12/2014 | 11:52 | S.M. | 8 at $115 | 9/20/2014 |
| 9/15/2014 | 10:11 | B.B. | 19 at $120 | 10/18/2014 |
| 9/15/2014 | 10:14 | S.M. | 11 at $120 | 10/18/2014 |
| 9/17/2014 | 15:29 | S.M. | 1 at $120 | 9/20/2014 |
| 9/17/2014 | 15:31 | **E. MILLER** | 1 at $115 | 9/20/2014 |
| 9/17/2014 | 15:32 | **E. MILLER** | 1 at $115 | 9/20/2014 |

38.     In addition to the purchases of Concur securities listed above, on or about September 12, 2014, K.D. separately purchased the following additional near-term, out-of-the-money call options in his account after speaking with **D. MILLER**:

| Approx. Date | Approx. Time (Central) | Account Holder | Strike Price | Expiry Date |
|---|---|---|---|---|
| 9/12/2014 | 11:13 | K.D. | 38 at $120 | 10/18/2014 |
| 9/12/2014 | 11:16 | K.D. | 10 at $115 | 9/20/2014 |
| 9/12/2014 | 11:20 | K.D. | 5 at $125 | 10/18/2014 |

## G.     Public Announcement of the Concur Acquisition

39.     During the period that **D. MILLER**, with the knowledge and assistance of **E. MILLER** and others, purchased near-term, out-of-the-money call options, **SALIS** monitored the progress of the purchases.  In addition to speaking regularly with **D. MILLER**, **SALIS** accessed the online brokerage accounts of **D. MILLER** and **E. MILLER** from California and elsewhere. By accessing these brokerage accounts, **SALIS** observed the call options that had been purchased in the accounts **D. MILLER** and **E. MILLER**.

40.     On or about September 17, 2014, **SALIS**, who was visiting SAP's offices in Germany, learned from a SAP colleague that the Concur Acquisition would be publicly announced on September 18, 2014.  From Germany, **SALIS** called **D. MILLER** and informed him of this fact.  After the telephone call with **SALIS**, **D. MILLER** called **E. MILLER**, and then **D. MILLER** purchased additional near-term, out-of-the-money Concur call options in the brokerage accounts of **E. MILLER** and S.M.

41.     On or about September 18, 2014, before the public announcement of the Concur Acquisition, **D. MILLER** called Broker A.  On the call, **D. MILLER** inquired into how one sold

call options in a brokerage account.  **D. MILLER** stated on the call that he was asking because he was "trying to prepare myself if something happened."

42.     Soon after the public announcement of the Concur Acquisition, **D. MILLER**, **E. MILLER**, and others sold the Concur call options that were previously purchased in their brokerage accounts based on the Inside Information provided by **SALIS**, and in doing so netted substantial profits.  Trades placed in the brokerage account of **D. MILLER** netted profits of approximately $119,000; trades placed in the brokerage account of **E. MILLER** netted profits of approximately $149,000; trades placed in the brokerage account held jointly by S.M. and E.M. netted profits of approximately $147,000; trades placed in the brokerage account of B.B. netted profits of approximately $52,000; and trades placed in the brokerage account of K.D. netted profits of approximately $38,000.

**H.**     **Withdrawals From Brokerage Accounts and Misrepresentations to Broker A After the Sale of Options**

43.     After the sale of the Concur call options netted a substantial profit in each of the five brokerage accounts, **D. MILLER**, **E. MILLER**, and others began to systematically withdraw money from the brokerage accounts.  Initially, in order to avoid suspicion and minimize detection, **D. MILLER** and **E. MILLER** withdrew, and instructed others to withdraw, money from the accounts in denominations of less than $10,000, as summarized in the following chart.

| Approximate Date | Brokerage Account Holder | Amount Requested from Broker A |
|---|---|---|
| 9/22/2014 | **D. MILLER** | $9,500 |
| 9/23/2014 | B.B. | $8,000 |
| 9/24/2014 | K.D. | $7,500 |
| 9/25/2014 | **E. MILLER** | $9,500 |

| 10/1/2014 | **E. MILLER** | $9,500 |
|-----------|---------------|--------|
| 10/3/2014 | B.B. | $9,800 |
| 10/3/2014 | **D. MILLER** | $9,800 |
| 10/8/2014 | **D. MILLER** | $9,700 |

44.     On or about September 22, 2014, **D. MILLER** called Broker A to request a withdrawal of $9,500 from his brokerage account.  Later in the day, an employee of Broker A who worked at the local Merrillville, Indiana branch of Broker A called **D. MILLER** regarding his earlier withdrawal request.  During that call, **D. MILLER** made false statements to the Broker A employee regarding (1) the source of the information upon which he traded and (2) his background in the technology sector.

45.     After the call with Broker A, on or about September 22, 2014, **D. MILLER** instructed **E. MILLER** and E.M. not to contact Broker A's Merrillville, Indiana branch to withdraw money from the brokerage accounts.

## I.     Concealed Payments to D. MILLER and Personal Benefits to SALIS

46.     After obtaining illicit profits from their trading on the Inside Information, **D. MILLER**, **E. MILLER**, and others arranged for part of the proceeds in the brokerage accounts to be transferred to **D. MILLER**, and distributed a portion of the profits to **SALIS**.

47.     In order to avoid suspicion and minimize detection, many of the money transfers to **D. MILLER** and **SALIS** were in cash and/or in denominations of less than $10,000.  Likewise, **SALIS** and **D. MILLER** deposited proceeds that they received from **E. MILLER** and others into their respective bank accounts in denominations under $10,000.

48.     Examples of payments to **D. MILLER** and **SALIS** include, but are not limited to, the following transactions:

a. On or about September 25, 2014, **D. MILLER**, B.B., and K.D. traveled to San Francisco, California, where they met with **SALIS**. On or about September 26, 2014, **SALIS** made three cash deposits into his bank account totaling approximately $4,900.

b. Between on or about October 19, 2014 and October 21, 2014, **SALIS** traveled from California to Indiana to receive a portion of the proceeds from the trading of Concur call options. On or about October 20, 2014, two co-conspirators went to a U.S. Post Office in Munster, Indiana and requested to buy money orders totaling approximately $6,000 with cash, falsely stating to a postal employee that the money came from gambling winnings. When informed by a postal employee that purchase of a money order over $3,000 would require the completion of a transactional form, the co-conspirators refused to complete the log and instead requested three money orders totaling $2,900. On or about October 21, 2014, **SALIS** deposited the same three money orders into his bank account, as well as an additional approximately $500 in cash. The same day, **SALIS** deposited approximately $7,000 in cash into an automated teller machine ("ATM") located in the greater Chicago area.

c. **D. MILLER** received multiple checks from **E. MILLER** and B.B. in amounts under $10,000. On or about October 15, 2014, **D. MILLER** received two cashier's checks from B.B., each in the amount of approximately $9,500. One check was made out to **D. MILLER** and the other to **D. MILLER**'s wife. On or about October 29, 2014, **E. MILLER** obtained two cashier's checks, each in the amount of approximately $9,500. One check was made out to **D. MILLER** and the other to **D. MILLER**'s wife.

> d. Between on or about January 13, 2015 and February 6, 2015, **SALIS** deposited over $22,000 in cash into his bank account through multiple deposits, each under $10,000.
>
> e. On or about April 10, 2015, **D. MILLER** flew to San Francisco and delivered cash to **SALIS**. On or about April 14, 2015, **SALIS** deposited $8,900 in cash into his bank account.

49.     On or about May 23, 2015, **D. MILLER**, **E. MILLER**, and E.M. transferred approximately $80,000 of the profits from the purchase and sale of Concur call options to **SALIS**. The payments were described as an investment in a company formed by **SALIS**.

## III.    FALSE STATEMENTS AND OBSTRUCTION

50.     On or about July 15, 2015, law enforcement agents interviewed **D. MILLER** at his residence in Dyer, Indiana. During the interview, **D. MILLER** was asked a series of questions related to his involvement in the purchase of call options, including the purchase of Concur call options in or around August 2014 and September 2014. During the interview, **D. MILLER** made a series of material false statements, including but not limited to statements that:

> a. **D. MILLER** only spoke to **SALIS** a few times a year;
>
> b. **D. MILLER** had followed Concur on his own prior to purchasing the call options;
>
> c. **D. MILLER** purchased the Concur options without **SALIS**'s involvement; and
>
> d. **D. MILLER** had not previously purchased call options in 2008 based on a tip from **SALIS**.

51.     On or about July 16, 2015, **D. MILLER** and **E. MILLER** each received letter from the U.S. Department of Justice notifying them that they were targets of an active investigation by a federal grand jury investigating allegations of insider trading and other crimes.

52.     In or around July 2015, **D. MILLER** and **E. MILLER** purchased prepaid cellular telephones.  After being contacted by law enforcement, **D. MILLER** and **E. MILLER** used these prepaid cellular telephones to discuss the government's investigation and coordinate their responses to law enforcement.  **E. MILLER** also used his prepaid cellular telephone to discuss the case with another individual, P.K., via text messages.

53.     On or about July 23, 2015, **D. MILLER** and **E. MILLER** each received a notice from the U.S. Securities and Exchange Commission ("SEC") notifying them that the SEC had entered a formal order of investigation into trading of Concur securities and that the SEC had issued subpoenas for banking records related to the accounts of **D. MILLER** and **E. MILLER**.

54.     On or about July 29, 2015, counsel for SAP interviewed **SALIS** and informed him of an ongoing government investigation into potential wrongful disclosures of material, nonpublic information regarding SAP's acquisition of Concur.  Counsel for SAP informed **SALIS** that SAP was cooperating with the government and expected to share any information **SALIS** gave to SAP with the government.  In attempts to conceal his wrongful conduct, **SALIS** made false statements to counsel for SAP, including but not limited to:

   a.  **SALIS** was not aware if **D. MILLER** had traded Concur options or other securities in connection with the Concur Acquisition; and

   b.  **SALIS** had not discussed Concur with **D. MILLER** in August 2014.

55.     In or around August 2015, **D. MILLER** and **E. MILLER** disposed of the prepaid cellular telephones they had previously purchased, in order to prevent law enforcement from obtaining their text messages regarding their trading in Concur securities.  Additionally, **E. MILLER** deleted text messages from another cellular telephone he used; the text messages that **E. MILLER** deleted from his cellular telephone included but were not limited to messages

between **E. MILLER** and P.K. from September 2014 that discussed the purchase of Concur securities ahead of the public announcement of the Concur Acquisition.

56.    On or about July 15, 2016, **E. MILLER** sent a text message to B.B., stating that there would be "a major f****** problem" if B.B. cooperated with the federal investigation.

## IV.    THE VICTIMS

57.    As a result of the scheme described above, **SALIS, D. MILLER,** and **E. MILLER** misappropriated the confidential and proprietary information of SAP.

58.    Between in or around September 2014 and October 2014, counterparties to the purchase and sale of securities executed through the brokerage accounts of **D. MILLER, E. MILLER,** S.M., B.B., and K.D. collectively lost over $500,000.

## COUNT ONE

**Conspiracy to Commit Securities Fraud and Wire Fraud
(18 U.S.C. § 1349)**

**[Defendants SALIS, D. MILLER, and E. MILLER]**

59.     Paragraphs 1 through 58 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

60.     From in or around at least August 2014 and continuing through in or around at least April 2015, in the Northern District of Indiana and elsewhere, defendants **CHRISTOPHER G. SALIS**, **DOUGLAS M. MILLER**, and **EDWARD M. MILLER** did knowingly and intentionally conspire and agree with other individuals known and unknown to the Grand Jury, to:

a.     knowingly and willfully, and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purposes of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

b.     knowingly execute and attempt to execute a scheme and artifice (a) to defraud any person in connection with a security of Concur, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*), and (b) to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property, in connection with the purchase and sale of securities issued by Concur, an issuer with a class of securities

17

registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*), in violation of Title 18, United States Code, Section 1348.

## PURPOSE OF THE CONSPIRACY

61.     The Grand Jury realleges and incorporates by reference paragraph 22 of this Indictment as a description of the purpose the conspiracy.

## MANNERS AND MEANS OF THE CONSPIRACY

62.     The Grand Jury realleges and incorporates by reference paragraphs 23 through 58 of this Indictment as a description of the manner and means of the conspiracy.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO THROUGH SEVEN

### Wire Fraud
### (18 U.S.C. §§ 1343 and 2)

### [Defendants SALIS, D. MILLER, and E. MILLER]

63.     Paragraphs 1 through 58 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

64.     From at least in or around August 2014, the exact date being unknown to the Grand Jury, through in or around April 2015, in the Northern District of Indiana and elsewhere, defendants **CHRISTOPHER G. SALIS**, **DOUGLAS M. MILLER**, and **EDWARD M. MILLER**, aided and abetted by others known and unknown to the Grand Jury, did knowingly and willfully, and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purposes of executing such scheme and artifice.

### PURPOSE OF THE SCHEME AND ARTIFICE TO DEFRAUD

65.     The Grand Jury realleges and incorporates by reference paragraph 22 of this Indictment as a description of the purpose of the scheme.

### THE SCHEME AND ARTIFICE TO DEFRAUD

66.     The Grand Jury realleges and incorporates by reference paragraphs 21 and 23 through 58 of this Indictment as a description of the scheme.

## USE OF THE WIRES

67.     On or about the dates specified as to each count below, **SALIS**, **D. MILLER**, and

**E. MILLER** in the Northern District of Indiana and elsewhere, for the purpose of executing the

aforesaid scheme and artifice to defraud, did knowingly transmit and cause to be transmitted, by

means of wire communications in interstate and foreign commerce, certain writings, signs, signals,

pictures and sounds, as more particularly described below:

| Count | Defendant(s) | Approximate Date | Description of Wire Communication |
|-------|--------------|------------------|-----------------------------------|
| 2 | **SALIS** **D. MILLER** | August 24, 2014 | Telephone call between **SALIS**, in California, and **D. MILLER**, in Indiana |
| 3 | **SALIS** **D. MILLER** | August 25, 2014 | Telephone call between **SALIS**, in California, and **D. MILLER**, in Indiana |
| 4 | **D. MILLER** | September 9, 2014 | Online submission of B.B.'s Options Application received from **D. MILLER**'s home in Indiana to server of Broker A in Arizona |
| 5 | **SALIS** **D. MILLER** **E. MILLER** | September 17, 2014 | Telephone call between **SALIS**, in Germany, and **D. MILLER**, in Indiana |
| 6 | **D. MILLER** | September 18, 2014 | Telephone call between **D. MILLER**, in Indiana, and employee from Broker A, in Arizona |
| 7 | **SALIS** **D. MILLER** | October 17, 2014 | Email from **SALIS**, in California, to **D. MILLER**, in Indiana, containing flight itinerary to Chicago |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS EIGHT THROUGH TWELVE

### Securities Fraud
### (18 U.S.C. § 1348)

### [Defendants SALIS, D. MILLER, and E. MILLER]

68.     Paragraphs 1 through 58 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

69.     On or about the dates set forth below, in the Northern District of Indiana and elsewhere, defendants **CHRISTOPHER G. SALIS**, **DOUGLAS M. MILLER**, and **EDWARD M. MILLER**, aided and abetted by others known and unknown to the Grand Jury, did knowingly execute and attempt to execute a scheme and artifice (a) to defraud any person in connection with a security of Concur, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*), and (b) to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property, in connection with the purchase and sale of securities issued by Concur, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*), to wit, before the Concur Acquisition was publicly announced, **SALIS**, **D. MILLER**, and **E. MILLER** caused the purchase of the following Concur call options on the basis of, in whole or in part, the Inside Information, in violation of a duty of trust and confidence owed to SAP, to wit:

| Count | Defendant(s) | Approximate Date | Description of Transaction |
| --- | --- | --- | --- |
| 8 | **SALIS D. MILLER** | August 25, 2014 | Purchase of 69 Concur call options, strike price of $110, expiry date October 18, 2014, in **D. MILLER**'s brokerage account. |
| 9 | **SALIS D. MILLER** | August 25, 2014 | Purchase of 8 Concur call options, strike price $115, expiry date September 20, 2014, in **D. MILLER**'s brokerage account. |

| 10 | **SALIS D. MILLER** | September 11, 2014 | Purchase of 20 Concur call options, strike price of $120, expiry date October 18, 2014, in B.B.'s brokerage account. |
|----|---------------------|---------------------|----------------------------------------------------------------------------------------------------------------------|
| 11 | **SALIS D. MILLER E. MILLER** | September 17, 2014 | Purchase of 2 Concur call options, strike price of $115, expiry date September 20, 2014, in **E. MILLER**'s brokerage account. |
| 12 | **SALIS D. MILLER** | September 17, 2014 | Purchase of 1 Concur call option, strike price of $120, expiry date September 20, 2014, in S.M.'s brokerage account. |

All in violation of Title 18, United States Code, Sections 1348 and 2.

## COUNT THIRTEEN

### Conspiracy to Commit Money Laundering
### (18 U.S.C. § 1956(h))

### [Defendants SALIS, D. MILLER, and E. MILLER]

70.    Paragraphs 1 through 58 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

71.    From in or around at least August 2014 and continuing through in or around at least April 2015, in the Northern District of Indiana and elsewhere, defendants **CHRISTOPHER G. SALIS**, **DOUGLAS M. MILLER**, and **EDWARD M. MILLER**, did knowingly, willfully, and unlawfully combine, conspire, confederate, and agree with each other, and with other individuals known and unknown, to commit certain offenses under Title 18, United States Code, Sections 1956 and 1957, including:

a.    To knowingly conduct and attempt to conduct financial transactions affecting interstate commerce, which transactions in fact involved the proceeds of specified unlawful activity, that is, securities fraud in violation of Title 18, United States Code, 1348, and wire fraud in violation of Title 18, United States Code, 1343, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and,

b.    To knowingly engage, attempt to engage, and cause and aid and abet others to engage in monetary transactions in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, that is securities fraud

in violation of securities fraud in violation of Title 18, United States Code, Section 1348; and wire fraud in violation of Title 18, United States Code, Section 1343, in violation of Title 18, United States Code, Sections 1957 and 2.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNT FOURTEEN

**Conspiracy to Structure Currency Transactions Involving a Financial Institution for the Purpose of Evading the Reporting Requirements
(18 U.S.C. § 371)**

### [Defendants SALIS, D. MILLER, and E. MILLER]

72.     Paragraphs 1 through 56 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

73.     From in or around September 2014 and continuing through in or around at least April 2015, in the Northern District of Indiana and elsewhere, defendants **CHRISTOPHER G. SALIS, DOUGLAS M. MILLER**, and **EDWARD M. MILLER** did knowingly, intentionally, and unlawfully combine, conspire, confederate, and agree with other individuals known and unknown, to commit certain offenses against the United States, namely, knowingly and for the purpose of evading the reporting requirements of Section 5313(a) of Title 31, United States Code, and the regulations promulgated thereunder, structured or assisted in structuring or attempted to structure or assist in structuring, transactions with one or more domestic financial institutions, in violation of Title 31, United States Code, Section 5324(a)(3).

## PURPOSE OF THE CONSPIRACY

74.     The purpose of the conspiracy was for **SALIS, D. MILLER**, and **E. MILLER** to deposit proceeds from the purchase and sale of securities by **D. MILLER, E. MILLER**, and others into financial institutions without triggering scrutiny, which may have resulted from the financial institutions' filing of Currency Transaction Reports.

## MANNER AND MEANS OF THE CONSPIRACY

75.     Title 31, United States Code, Section 5313(a) and Title 31, Code of Federal Regulations, Section 1010.311 required domestic financial institutions to report the transaction to

the Internal Revenue Service ("IRS") on Form 4789, a Currency Transaction Report ("CTR"), for each deposit, withdrawal, exchange of currency, or other payment or transfer involving currency of more than $10,000. CTRs are used by law enforcement to identify various illegal activities.

76.     Taking active steps to cause financial institutions to fail to file CTRs is often referred to as "structuring." Structuring cash deposits or withdrawals to avoid triggering the filing of a CTR by a financial institution is prohibited by Title 31, United States Code, Section 5324(a).

77.     At all relevant times, Wells Fargo was a domestic financial institution subject to the CTR requirements described above.

78.     In order to effectuate the conspiracy, **D. MILLER**, **E. MILLER**, and others provided **SALIS** with cash and other proceeds collected from the trading of Concur call options based on information provided by **SALIS**, and **SALIS** at various times made separate cash deposits at Wells Fargo in amounts less than $10,000.

## OVERT ACTS

79.     On or about the dates below, in furtherance of the conspiracy and to effectuate the objects and purposes of the conspiracy, **SALIS**, **D. MILLER**, **E. MILLER**, and others known and unknown to the Grand Jury, committed and caused to be committed the following overt acts, in addition to others, in the Northern District of Indiana, and elsewhere, to evade currency transaction reporting requirements:

| Defendant(s) | Approximate Date | Description of Transaction |
|---|---|---|
| **D. MILLER** | October 15, 2014 | $9,300 cash withdrawal |
| **SALIS** | October 21, 2014 | $2,250 cash deposit |
| **SALIS** | October 21, 2014 | $2,300 cash deposit |
| **SALIS** | October 21, 2014 | $2,450 cash deposit |

| SALIS | October 21, 2014 | $500 cash deposit |
|---|---|---|
| SALIS | October 21, 2014 | $2,900 deposit of money orders |
| E. MILLER | October 29, 2014 | $9,500 cash withdrawal |
| D. MILLER | November 12, 2014 | $8,000 cash withdrawal |
| SALIS | November 25, 2014 | $6,200 cash deposit |
| E. MILLER | January 3, 2015 | $7,500 cash withdrawal |
| SALIS | January 14, 2015 | $2,000 cash deposit |
| SALIS | January 21, 2015 | $2,000 cash deposit |
| SALIS | January 22, 2015 | $6,800 cash deposit |
| SALIS | January 30, 2015 | $4,000 cash deposit |
| SALIS | February 4, 2015 | $800 cash deposit |
| SALIS | February 5, 2015 | $4,000 cash deposit |
| SALIS | February 6, 2015 | $3,000 cash deposit |

All in violation of Title 18, United States Code, Section 371.

## COUNT FIFTEEN

**False Statements**
**(18 U.S.C. § 1001(a)(2))**

**[Defendant D. MILLER]**

80.     Paragraphs 1 through 58 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

81.     On or about July 15, 2015, in the Northern District of Indiana and elsewhere, defendant **DOUGLAS M. MILLER**, in a matter within the jurisdiction of the executive branch of the Government of the United States, to wit the United States Postal Inspection Service and the United States Department of Justice, did knowingly and willfully make a false, fraudulent, and fictitious material statement and representation, in that the defendant falsely stated:

(a) **D. MILLER** only spoke to **SALIS** a few times a year;

(b) **D. MILLER** purchased the Concur options without **SALIS**'s involvement; and

(c) **D. MILLER** had not previously purchased call options in 2008 based on a tip from **SALIS**.

All in violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT SIXTEEN

**Obstruction of Justice
(18 U.S.C. § 1512(c)(1))**

**[Defendant E. MILLER]**

82.    Paragraphs 1 through 58 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

83.    In or around August 2015, in the Northern District of Indiana and elsewhere, defendant **EDWARD M. MILLER** did corruptly alter, destroy, mutilate, and conceal, a record, document, and object, and attempted to do so: namely, electronic data contained within an electronic device, to wit, a prepaid cellular telephone, with the intent to impair its integrity and availability for use in an official proceeding, to wit: a federal grand jury proceeding in the Northern District of Indiana and a SEC investigation into the trading of Concur securities.

All in violation of Title 18, United States Code, Section 1512(c)(1).

## COUNT SEVENTEEN

**Witness Harassment**
**(18 U.S.C. § 1512(d)(1) & (d)(2))**

**[Defendant E. MILLER]**

84.     Paragraphs 1 through 58 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

85.     On or about July 15, 2016, in the Northern District of Indiana and elsewhere, defendant **EDWARD M. MILLER**, did and attempted to, intentionally harass another person, B.B., and thereby knowingly did attempt to hinder, delay, prevent, and dissuade B.B. (a) from attending and testifying in an official proceeding and (b) reporting to a law enforcement the commission and possible commission of a Federal offense, to wit, sending a text message to B.B. that stated there would be "a major f****** problem" if B.B. cooperated with the government.

All in violation of Title 18, United States Code, Section 1512(d)(1) and (d)(2).

## CRIMINAL FORFEITURE ALLEGATIONS AS TO COUNTS 1-12, 16, AND 17

86.     The factual allegations contained in Counts One through Twelve, Sixteen, and Seventeen of this Indictment are hereby re-alleged and are incorporated by reference for the purpose of alleging forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) , and Title 28, United States Code, Section 2461(c).

87.     Upon conviction of the offenses alleged in Counts One through Twelve, Sixteen, and Seventeen, namely, conspiracy to commit securities fraud and wire fraud in violation of Title 18, United States Code, Section 1349; wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2; securities fraud, in violation of Title 18, United States Code, Sections 1348 and 2; obstruction of justice, in violation of Title 18, United States Code, Section 1512(c)(1); and witness harassment, in violation of Title 18, United States Code, Section 1512(d)(1) and (d)(2); the defendants, **CHRISTOPHER G. SALIS**, **DOUGLAS M. MILLER**, and **EDWARD M. MILLER**, shall forfeit to the United States any and all property, real or personal, which constitutes or is derived from proceeds traceable to the aforementioned offenses, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), and any property traceable to such property. The property to be forfeited shall include, but is not limited to, the following:

      a.  Money Judgment

            i.  Judgment in favor of the United States of America equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to violations of Title 18, United States Code, Section 1349; Title 18, United States Code, Sections 1343 and 2; Title 18, United States Code,

Sections 1348 and 2; Title 18, United States Code, Section 1512(c)(1); and

Title 18, United States Code, Section 1512(d)(1) and (d)(2).

88.    If any of the property described above, as a result of any act or omission of the

**CHRISTOPHER G. SALIS, DOUGLAS M. MILLER**, and **EDWARD M. MILLER**:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property that cannot be divided without

        difficulty;

it is the intent of the United States, pursuant Title 21, United States Code, Section 853(p), as

incorporated by Title 18, United States Code, Section 982(b), to seek the forfeiture of any other

property of **CHRISTOPHER G. SALIS, DOUGLAS M. MILLER**, and **EDWARD M.**

**MILLER** up to the value of the above forfeitable property and obtain a money judgment in an

amount equal to the value of the property involved in the violations.

## <u>CRIMINAL FORFEITURE ALLEGATION AS TO COUNT 13</u>

89.    The factual allegations contained in Count Thirteen of this Indictment are hereby

re-alleged and are incorporated by reference for the purpose of alleging forfeiture to the United

States pursuant to Title 18, United States Code, Section 982(a)(1).

90.    Upon conviction of the offense alleged in Count Thirteen, conspiracy to commit

money laundering in violation of Title 18, United States Code, Section 1956(h), the defendants,

**CHRISTOPHER G. SALIS, DOUGLAS M. MILLER**, and **EDWARD M. MILLER**, shall

forfeit to the United States any and all property, real or personal, involved in this offense, and any

property traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1). The property to be forfeited shall include, but is not limited to, the following:

    a.  Money Judgment

        i.  Judgment in favor of the United States of America equal to the value of any property, real or personal, involved in the conspiracy to commit money laundering, for which **CHRISTOPHER G. SALIS, DOUGLAS M. MILLER**, and **EDWARD M. MILLER** are jointly and severally liable.

91.    If any of the property described above, as a result of any act or omission of the **CHRISTOPHER G. SALIS, DOUGLAS M. MILLER**, and **EDWARD M. MILLER**:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property that cannot be divided without difficulty;

it is the intent of the United States, pursuant Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek the forfeiture of any other property of **CHRISTOPHER G. SALIS, DOUGLAS M. MILLER**, and **EDWARD M. MILLER** up to the value of the above forfeitable property and obtain a money judgment in an amount equal to the value of the property involved in the violation.

## CRIMINAL FORFEITURE ALLEGATION AS TO COUNT 14

92.     The factual allegations contained in Count Fourteen of this Indictment are hereby re-alleged and are incorporated by reference for the purpose of alleging forfeiture to the United States pursuant to Title 31, United States Code, Section 5317(c)(1).

93.     Upon conviction of the offense alleged in Count Fourteen, conspiracy to structure financial transactions, in violation of Title 18, United States Code, Section 371, the defendants, **CHRISTOPHER G. SALIS, DOUGLAS M. MILLER**, and **EDWARD M. MILLER**, shall forfeit to the United States any and all property, real or personal, involved in the offense and any property traceable to such property, pursuant to Title 31, United States Code, Section 5317(c)(1). The property to be forfeited shall include, but is not limited to, the following:

  a.  Money Judgment

      i.  Judgment in favor of the United States of America equal to the value of any property, real or personal, involved in the conspiracy to structure currency transactions involving a financial institution to evade the reporting requirements, for which **CHRISTOPHER G. SALIS, DOUGLAS M. MILLER**, and **EDWARD M. MILLER** are jointly and severally liable.

94.     If any of the property described above, as a result of any act or omission of the **CHRISTOPHER G. SALIS, DOUGLAS M. MILLER**, and **EDWARD M. MILLER**:

  a.    cannot be located upon the exercise of due diligence;

  b.    has been transferred or sold to, or deposited with, a third party;

  c.    has been placed beyond the jurisdiction of the Court;

  d.    has been substantially diminished in value; or

  e.    has been commingled with other property that cannot be divided without

difficulty;

it is the intent of the United States, pursuant Title 21, United States Code, Section 853(p), as

incorporated by Title 18, United States Code, Section 982(b), to seek the forfeiture of any other

property of **CHRISTOPHER G. SALIS**, **DOUGLAS M. MILLER**, and **EDWARD M.**

**MILLER** up to the value of the above forfeitable property and obtain a money judgment in an

amount equal to the value of the property involved in the violation.


A TRUE BILL:


                                                S/FOREPERSON
                                                FOREPERSON



ANDREW WEISSMANN
Chief
Fraud Section, Criminal Division
U.S. Department of Justice



By:   S/ L. Rush Atkinson
      L. Rush Atkinson
      Trial Attorney
      Fraud Section, Criminal Division
      U.S. Department of Justice

      Jennifer G. Ballantyne
      Trial Attorney
      Fraud Section, Criminal Division
      U.S. Department of Justice

      Gary A. Winters
      Trial Attorney
      Fraud Section, Criminal Division
      U.S. Department of Justice